UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINCOLN GENERAL INSURANCE CO., | **1:06-cv-01143 OWW SMS** |
| Plaintiff, | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| GATEWAY SECURITY SERVICES, INC., et al., | |
| Defendant. | |

## I.   INTRODUCTION

This is a declarative relief action brought by Plaintiff Lincoln General Insurance Co. ("LGIC" or "Lincoln General") concerning the duty to defend the claims alleged in an underlying state court personal injury action, *Devine v. Hughes*, Kings County Superior Court, Case No. 06C0015 ("Underlying Action"). The underlying action alleges that Mr. Ramon Devine ("Devine") suffered injuries in a motor vehicle accident caused by Debra Hughes during the course of her employment for Hughes Towing and Auto Wrecking ("Hughes Towing").  Also named as defendants are Debrah Hughes and Donald Hughes, co-owners and employees of Gateway Security Services, Inc. ("Gateway") which does business as Hughes Towing.

Before the court for decision is Lincoln General's motion

1

for summary judgment on its duty to defend claim. At the time of the accident, Gateway's vehicles were insured by Lincoln General under an insurance policy which extended coverage to automobiles owned by employees while used in the "business or personal affairs" of Gateway.  Lincoln General seeks a declaration that it has no duty to defend Gateway or the Hughes in the state personal injury lawsuit on the ground that the policy does not cover Mrs. Hughes use of her personal vehicle during her commute.

Defendants oppose summary judgment, arguing that the Lincoln General insurance policy language is ambiguous and that there are disputes as to material facts which make it inappropriate to issue summary judgment on this claim.

## II.   FACTUAL BACKGROUND

### A.   The Defendant.

Gateway, d.b.a. Hughes Towing, is a California corporation owned by Donald and Debrah Hughes.  (Defendant's Disputed Material Fact ("DMF") #1.)  Donald and Debrah are the only shareholders of Gateway, as well as its corporate officers and employees (DMF #2.)

### B.   The Automobile Accident.

On July 18, 2005, Debrah Hughes was involved in an automobile accident while commuting to work at Gateway.  On January 26, 2006, Ramon Devine and Lucinda Devine filed suit against the Hughes, Gateway, and various related entities, alleging that Ramon Devine suffered injuries as a result of the accident. *See Devine, et al. v. Hughes, et al.,* Kings County Superior Court, Case no. 06C0015.  (Plaintiff's Statement of

2

Undisputed Material Fact ("PSUMF") ##1-2.)

     C.   <u>The LGIC Insurance Policy</u>.

     Gateway was first insured with LGIC in the Spring of 2003. With the assistance of R.A. Storelee Insurance Agency, Gateway submitted an Application for Towing Insurance to LGIC, dated April 9, 2003.  The insurance application contains the following question and response, under Section IV, "Fleet":

          02.  Do employees regularly use their vehicles in applicant's business? _____  Yes. __X__  No.

(PSUMF #4.)

     The underwriter for LGIC stated in a declaration that an applicant's answer to the above question is important and material to LGIC in evaluating the degree of the risk, because an affirmative response significantly impacts the risks involved and increases the likelihood of exposure to liability.  (PSUMF #5.) Relying upon the information contained in Hughes Towing' insurance application, LGIC issued a policy to Gateway.  (PSUMF #6.)

     Again, with the assistance of R.A. Storelee Insurance Agency, Gateway submitted a renewal application in March 2005. Gateway was not required to submit a revised or updated Towing Insurance Application in connection with the renewal, nor was Gateway asked to otherwise confirm that all of the original answers in the application remained current and/or accurate. (DMF ##7-8.)  The only document Gateway recalls signing during the renewal of policies process from LGIC was a form confirming reduced limits for the uninsured motorist coverage.  (DMF #9.)

     After receiving the renewal application, Lincoln General

issued Business Auto Coverage Policy No. LTP101263-02, effective May 11, 2005 to May 11, 2006 to named insured Gateway Security Services, Inc., d.b.a. Hughes Towing & Auto Wrecking (the "Policy").  (UMF #6.)  This was the policy in operation at the time of the accident.

Liability coverage was furnished under Business Auto Coverage Form CA 0001 (edition 10/01), which provides a combined single liability limit of $1 million in connection with "Covered Autos" as designated on the policy declarations.  Liability coverage is furnished for "Covered Autos" under "Symbols 7, 8, and 9," which provide coverage, respectively, for "Specifically Described Autos," "Hired Autos," and "Non-Owned Autos" while used in the named insured's business.

The Lincoln General Policy provides, in part, as follows:

SECTION I — COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages.  The following numerical symbols describe the "autos" that may be covered "autos".  The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

A.    Description of Covered Auto Designation Symbols

***

| [Symbol 9] | Nonowed "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business.  This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |

SECTION II — LIABILITY COVERAGE

A.    Coverage

**4**

1
    We will pay all sums an "insured" legally must pay as
    damages because of "bodily injury" or "property damage"
2   to which this insurance applies, caused by an
    "accident" and resulting from the ownership,
3   maintenance or use of a covered "auto".

4                              ***

5   SECTION V—DEFINITIONS

6                              ***

7   B.  "Auto" means a land motor vehicle, "trailer" or
    semitrailer designed for travel on public roads but
8   does not include "mobile equipment".

9                              ***

10  F.  "Employee" includes a "leased worker".  "Employee"
    does not include a "temporary worker".
11
    G.  "Insured" means any person or organization
12  qualifying as an insured in the Who Is An Insured
    provision of the applicable coverage.  Except with
13  respect to Limit of Insurance, the coverage afforded
    applies separately to each insured who is seeking
14  coverage or against whom a claim or "suit" is brought.

15                             ***

16  J.  "Loss" means direct and accidental loss or damage.

17                             ***

18 (PSUMF #8; Plaintiff's Ex. 3 at LGI0018-44.)

19      Of central concern in this case is the following endorsement

20 which is part of the policy and modifies the "Who Is An Insured"

21 provision:

22                 THIS ENDORSEMENT CHANGES THE POLICY.
                       PLEASE READ IT CAREFULLY.
23
24                      EMPLOYEES AS INSUREDS

25  This endorsement modifies insurance provided under the
    following:
26
        BUSINESS AUTO COVERAGE FORM
27      MOTOR CARRIER COVERAGE FORM
        TRUCKERS COVERAGE FORM

28  With respect to coverage provided by this endorsement,

                              5

> the provisions of the Coverage Form apply unless modified by the endorsement.
>
> The following is added to the Section II—Liability Coverage, Paragraph A.1. Who Is An Insured Provision:
>
> **Any "employee" of yours is an "insured" while using a covered "auto" you don't own, hire or borrow in your business or your personal affairs**.

(PSUMF #8; emphasis added.)

Gateway asserts that it specifically paid to have this endorsement included in the LGIC policy because Mrs. Hughes occasionally used her vehicle in the business or personal affairs of Gateway.  (DMF #12.)  Gateway was never provided a definition of the phrase "business or personal affairs," but understood that the policy would provide liability coverage for Mrs. Hughes' use of her vehicle whenever she was involved with the business or personal affairs of Gateway.  (DMF #13.)

Defendants also assert that once Mrs. Hughes left home for work in the morning, she was available, on an as-needed basis, to run errands for Gateway and otherwise take phone calls, including personal phone calls, that could impact her activities for the day and thereby impact the personal affairs of Gateway.  (DMF #16.)  Moreover, Gateway expected Mrs. Hughes to use her personal vehicle to get to and from work, and to otherwise handle or respond to, as needed, the personal or business affairs of Gateway during the day.  (DMF #17.)  Accordingly, Gateway asserts that it understood that the "personal affairs" of Gateway included Mrs. Hughes' use of her vehicle to get to and from work, and any other activities she performed in running errands for the business.  (DMF #14.)

D.   **Mrs. Hughes' Examination Under Oath**.

6

On January 18, 2006, Debrah Hughes, appearing with her attorney, gave an Examination Under Oath ("EUO") before a certified reporter regarding the accident. (PSUMF #10.)  Mrs. Hughes testified that she was commuting from home to work at Hughes Towing at the time of the accident.  (PSUMF #11.)  She was driving her personal vehicle, a Cadillac, at the time.  (The Cadillac was not owned by Gateway, nor was it listed as a scheduled vehicle on the Policy.  (PSUMF ##9 & 12.))  The registered owner of the Cadillac involved in the accident is Debrah Hughes or Donald Hughes, not Gateway.  (PSUMF #13.)

Just before the accident, Mrs. Hughes made a brief stop at the Food King grocery store parking lot in order to take a personal call from her daughter on a cell phone.  (PSUMF #14.) Mrs. Hughes testified as follows during the EUO:

| | |
|---|---|
| Q: | What did you and your daughter talk about during this telephone call? |
| MR. McKAY: | Why is that relevant? |
| MS. LERCHE: | Well, I just wanted to know if it had anything to do with her business.  If it's personal, like I said, then just tell me it's just a personal call. |
| THE WITNESS: | It was personal. |
| | *** |
| MS. LERCHE: | Okay.  All I need to know is does it have anything to do with your business at Hughes Auto Wrecking. |
| A: | No. |

(PSUMF #15.)

Mrs. Hughes did not make any other stops between her home and the Food King parking lot.  (PSUMF #16.)  The accident occurred as Mrs. Hughes continued on her driving commute to work

after stopping in the Food King parking lot.  (PSUMF #19.)
Following the accident, Mrs. Hughes drove straight to work.
(PSUMF #20.)

Mrs. Hughes further testified during the EUO that she has no
set hours of work at Hughes Towing, but that she generally is at
work five days a week from 11 a.m. to 4 p.m.  (PSUMF #21.)  Her
work duties include driving her own personal car to make bank
deposits, go to the post office, buy cleaning supplies for the
business, and "sometimes get lunch for my husband and maybe a
couple of the guys[.]"  (PSUMF #22.)  Mrs. Hughes testified that
she does "not always" check into the office before performing
these outside duties.  (PSUMF #23.)  She does not receive
compensation for travel to and from work.  (PSUMF #24.)  On the
day of the accident, Mrs. Hughes did not perform any of the
duties which would require her to drive outside of the office.
(PSUMF #25.)

     E.   **Mrs. Hughes' Responses to Requests for Admission in the
Underlying Personal Injury Action**.

In the underlying personal injury action, Mrs. Hughes
responded to Requests for Admissions, Set One, as follows:

***

> 7.   At the time of the motor vehicle accident
> involving Deborah Hughes and Ramon Devine on July 18,
> 2005, Deborah Hughes was in the course and scope of her
> duties with Hughes Auto Wrecking and Towing.
>
> Response: Admit.
>
> 8.   On July 18, 2005, Deborah Hughes could not perform
> her job duties with Hughes Auto Wrecking and Towing
> without taking her vehicle to work.
>
> Response: Admit.

(PSUMF #27.)

8

**F.   Gateway's Intent With Respect to the Initial Insurance Application.**

When Gateway applied for LGIC insurance, it represented that no employee regularly used his or her personal vehicle in its business.  Gateway maintains that it considered Debrah's use of her vehicle, on an as-needed basis, to be "occasional" rather than "regular" use.  (DMF #18.)  At no time did anyone from LGIC provide Gateway with a definition of the phrase "regular use in applicant's business" as used in the Towing Insurance Application.  (DMF #19.)  Gateway acknowledges that Debrah's use of her personal vehicle to run Gateway errands may have increased over time since the April 9, 2003 application was submitted. Nevertheless, Gateway still does not consider Debrah's use to be "regular." (DMF #20.)

**G.   Other Insurance Coverage Issues.**

Gateway Security Services, Inc. is being defended in the underlying personal injury action by GMAC Insurance Company, pursuant to a personal automobile insurance policy issued by GMAC.  (Declaration of Lisa Hess ("Hess Decl."), ¶6; PE 4, 14:2-5.)

After Gateway was served with the underlying lawsuit and tendered its defense to LGIC, LGIC sent a letter to Gateway, dated March 28, 2006, stating that the allegations in the underlying personal injury action were "sufficient to trigger a defense of the company under the policy."  (DMF #22.)  The letter specifically stated that the allegations "clearly trigger the policy, for if the jury were to disbelieve the actual facts as set forth in Ms. HUGHES' statement and find that she was in the

course and scope of her employment, she would be deemed an insured under the Lincoln General policy."  (Id.)

On April 11, 2006, Lincoln General accepted defense of the named insured in the underlying personal injury claim under a reservation of rights.  (PSUMF #26.)

H.   <u>Recent Procedural History</u>.

On August 28, 2006, Lincoln General filed this lawsuit, which asserts two causes of action.  (Doc. 2.)  The first cause of action, for declaratory relief, seeks a judicial determination that Lincoln General (a) has no duty to defend or indemnify the claims or damages in the underlying personal injury lawsuit; (b) never had a duty to defend or indemnify claims or damages in the underlying lawsuit, © is entitled to withdraw from the defense and may stop paying defense costs, and (d) is entitled to reimbursement for defense costs incurred.

The second cause of action for rescission alleges that Hughes Towing made material misrepresentations in its insurance application by stating that its employees do not regularly use their vehicles for business.  Lincoln General alleges that it did not know these representations were false and relied upon the representations to its detriment.

On September 28, 2006, before a scheduling conference was held and before any discovery had taken place, Lincoln General filed its motion for summary judgment on both its duty to defend and rescission claims.  (Doc. 9.)  Discovery had not yet been conducted.  Gateway and the Hughes filed opposition and moved, under Federal Rule of Civil Procedure 56(f), to be permitted to conduct discovery before Lincoln General's summary judgment

motion was heard.  (Doc. 31, filed Oct. 23, 2006.)    Defendants Ramon and Lucinda Devine joined in Gateway's and the Hughes opposition, including a summary legal argument.  (Doc. 38, filed Oct. 24, 2006.)[1]

On January 29, 2007, after a brief hearing, the summary judgment hearing was continued under Fed. R. Civ. P. 56(f) to allow for the parties to pursue discovery and supplement the pleadings on two issues of concern.  First, the parties were asked to address the history, intent, and meaning of the specific policy language at issue, the "business or personal affairs" of the insured.  Second, they were asked to supplement their briefing with respect to the "going and coming rule" and its exceptions as related to policy coverage of an employee's commute to and from work where a personal vehicle is used on occasion for business purposes.

On June 26, 2007, Lincoln General filed a notice of withdrawal of its rescission claim from its pending motion for summary judgment.  (Doc. 52.)  Before the court for decision now is Lincoln General's motion for summary judgment on the duty to defend claim.

### III.   **STANDARD OF REVIEW**

---

[1] Plaintiff objects to the filing of this joinder, asserting that it should be disregarded because there is no authority under federal law for the filing of a joinder under such circumstances. (Doc. 39.)  The filing of joinders is common practice in the federal system.  Moreover, even if their opposition were disregarded, it is of no moment, as Plaintiff's motion must be denied based on the arguments and authorities presented in Gateway's and the Hughes' opposition briefing.

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56©; *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.* A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence must be viewed in a light most favorable to the non-moving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL 1490998 (9th Cir. 2001).  Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th

Cir. 2000).  However, if the non-moving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *Triton Energy Corp.*, 68 F.3d at 1221.  The non-moving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).  If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med., Inc.*, 343

13

F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

## IV.   DISCUSSION

A.   Motion for Summary Judgment on Lincoln General's Request for a Declaratory Judgment that it has no Duty to Defend and is Entitled to Reimbursement for Defense Costs Tendered.

Plaintiff moves for summary judgment on its claim for declaratory relief that it does not have a duty to defend or indemnify Defendants because the claims in the underlying personal injury action are not within the scope of the Policy. Specifically, Plaintiff contends that undisputed evidence establishes that Mrs. Hughes was not using her vehicle for the "business or personal affairs" of the named insured, Hughes Towing, and thus coverage is not triggered under the "Employees as Insureds" endorsement clause (Endorsement CA 99 33 02 99).

Defendants raise several objections.  They argue that the policy language is ambiguous and, therefore, the court should look to the insured's reasonable objective interpretation of the term at issue.  Defendants argue that there are material factual disputes regarding whether Mrs. Hughes was using her vehicle for the "business or personal affairs" of Hughes Towing.

1.   General Principles of California Insurance Law Regarding Policy Interpretation.

Under California law, an insurance company must defend its insured against a suit that potentially seeks damages within the coverage of its policy.  *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263,

14

275 (1966); *Montrose Chem. Corp. v. Superior Court,* 6 Cal.4th 287, 295 (1993).   In determining whether a duty to defend is owed, the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage.   *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 19 (1995).   Where extrinsic facts show there is no potential for coverage, the insurer has no duty to defend the action as a matter of law.   *Reagen's Vacuum Truck Service, Inc. v. Beaver Ins. Co.*, 31 Cal.App.4th 375, 384 (1994).   To establish it has no duty to defend, a carrier is entitled to rely not only on the facts alleged in the complaint, but also extrinsic facts it learns which establish the absence of coverage.   *Montrose Chem.*, 6 Cal.4th at 298-99, 300-301.

> [W]here the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability.

*Waller*, 11 Cal.4th at 19.

Here, there is a dispute over the meaning of the key policy term "business or personal affairs" as it appears in the "Employees as Insureds" endorsement clause and Symbol 9 of the Lincoln General Policy.   In California, the interpretation of an insurance policy follows a well-established set of rules.   As a general matter, "the mutual intention of the parties at the time the contract is formed governs [contract] interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 647-48 (2003)(citing Cal. Civ. Code, § 1636).   To discern the mutual intent of the parties, a court should apply the following rules, in sequence.   *See generally, Croskey, et al., Cal. Prac. Guide:*

*Insurance Litigation*, Ch. 4-A (The Rutter Group 2005).

**Rule 1: The Plain Meaning**.  If possible, the mutual intent of the parties is to be "inferred...solely from the written provisions of the contract."  *MacKinnon,* 31 Cal.4th at 647 (citing Cal. Civ. Code, § 1638).  If an examination of contractual language reveals a "clear and explicit" meaning, this meaning controls.  *Id*. at 647.  A court must interpret contractual language in its "ordinary and popular sense," unless terms are "used by the parties in a technical sense or a special meaning is given to them by usage."  *Id*. (citing Cal. Civ. Code, §§ 1638 and 1644).  A court must "attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the [] language."  *Id.* at 649.

A policy provision will be considered ambiguous, and therefore without a "clear and explicit meaning," when it is "capable of two or more constructions, both of which are reasonable."  *Id*. at 648.  But, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.; Waller v. Truck Ins. Exch. Inc.*, 11 Cal.4th 1, 18 (1995).  The lack of a policy definition does not necessarily render a term ambiguous.  *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal.4th 857, 868 (1998). It is appropriate to consider extrinsic evidence for the purpose of determining whether an ambiguity exists, *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 39-41 (1968), or to show that the parties attached a special meaning to certain terms, *ACL Tech., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal.App.4th 1773, 1793-94 (1993).

16

**Rule 2: The Insured's Objectively Reasonable Expectations.**
If a provision has no "clear and explicit meaning," ambiguity is "resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them at the time of formation." *E.M.M.I., Inc. v. Zurich Am. Ins. Co.*, 32 Cal.4th 465, 470 (2004). A court may consider extrinsic evidence to aid in the interpretation of an ambiguous provision. *Kavruck v. Blue Cross of Calif.*, 108 Cal.App.4th 773, 782 (2003).

**Rule 3: The Contra-Insurer Rule.** If application of the first two rules still does not eliminate the ambiguity, "ambiguous language is construed against the party who caused the uncertainty to exist." *E.M.M.I.*, 32 Cal.4th at 470. This third "contra-insurer rule" as applied to an insurance policy "protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured." *Id.* at 470-71. At this stage, "[a]ny ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." *Id.* at 471.[2]

**2.   Is the Policy Language Ambiguous?**

The relevant policy language is undisputed. The Policy only applies to bodily injury and property damage resulting from the ownership, maintenance or use of a "covered auto." The two

---

[2] If this dispute concerned exclusionary language, a fourth rule would require that any exclusion be "conspicuous, plain and clear." Although Defendant makes passing reference to this rule, the language at issue in this case <u>extends</u> coverage to employees in situations where an employee's personal vehicle is used in the "business or personal affairs" of the insured company. This is not exclusionary as it expands coverage.

critical Policy provisions are Symbol 9 and the CA 99 33 endorsement.   Symbol 9 provides coverage for <u>Hughes Towing</u> if automobiles owned by Hughes Towing's employees are involved in an accident, but only while such autos are being "used in your business or your personal affairs."   The words "you" and "your" are defined in the Policy to mean the named insured, Hughes Towing.   Endorsement CA 99 33 ("Employees As Insureds") extends similar coverage <u>to Mrs. Hughes</u>, as an individual.   Moreover, the coverage only applies if she is involved in an accident while using her automobile in the "business or personal affairs" of Hughes Towing.

Plaintiff asserts that the key phrase "business or personal affairs" is unambiguous.   The disputed policy language is contained within a standardized Insurance Services Office, Inc. ("ISO") form.   Specifically, the "Business Auto Coverage Form" (CA 00 01 07 97) is a standard insurance policy form issued by the ISO in 1996 for Business Auto policies.   (*See* Miller's Standard Insurance Policies Annotated, Vol. I, Policies, "Commercial Auto Forms," Annotated, p. 259, form: "CABAP", no. 1A9.)   The "Employees As Insureds" Endorsement (CA 99 33 02 99) is also taken from a standard ISO form that was issued in 1998 for Business Auto policies.   (*See Id*. at p. 400.69, form: "CAINS," no. 04.A, 04.A1.)

In support of their argument that the disputed policy language has a clear and unmistakable meaning, Plaintiff points in its reply brief to several cases from outside California which have found identical policy language taken from the ISO forms to

18

be unambiguous.[3]  **No California cases have interpreted the policy language "business or personal affairs."  But Plaintiff points out that in** *Alaska National Insurance Co. v. Harold Bryan*, **104 P.3d 1 (Ct. App. Wash. 2004), an employer's insurance carrier**

---

[3] In its opening brief, Plaintiff relied on a California case involving *respondeat superior* tort liability, which discusses the so-called "going and coming" rule.  The "going and coming" rule is a "special expression of the *respondeat superior* principle, which limits an employer's liability for his employee's torts to those committed in the course of the latter's employment." It generally stands for the proposition that an employee is not acting within the scope and course of employment while going to or returning from his or her place of work. *Harris v. Orodam Constructors*, 269 Cal.App.2d 911, 912 (1969).

> Activity "within the scope of employment" is the pivot of the employer's responsibility, but the pivoting action responds to two primary inquiries: (1) the activity's benefit to the employer's enterprise and (2) his right to control it.

*Id*. at 915-16.

Although no California cases have applied the "going and coming" rule to business automobile insurance policies, a number of Ohio cases have applied the rule to such policies which contain language limiting coverage to activities undertaken within the "course and scope of employment." *See e.g.*, *Whitman v. Traveler's Ins. Co.*, 2003 WL 22862009 (Ohio Ct.App. 2003). But, those cases all deal with insurance policies which have no specific language extending coverage beyond the default rule that employees are only covered by their employer's liability insurance when acting within the "course and scope of employment."  Defendant correctly points out that, in this case, we are dealing with specific language which extends coverage to acts taken in furtherance of the "business or personal affairs" of the covered employer.  Therefore, neither the California *respondeat superior* tort liability case nor the Ohio cases, which all concern the interpretation of the phrase "course and scope of employment," are directly relevant.  Plaintiff impliedly acknowledges this, by citing an entirely different line of cases in its reply brief.

sought a declaration that it was not required to provide coverage for a person who had been injured while riding as a passenger on the back of an employee's motorcycle.  The accident occurred while the pair were riding to the company's premises, where the employee was <u>living at the time</u>.  The employee was required to be on call 24 hours a day, and his motorcycle was shipped to premises by the company at no cost to the employee.  *Id*. at 4-5.  The applicable insurance policy applied only if the employee had been operating his motorcycle in the "business or personal affairs" of the employer at the time of the accident.

The plaintiffs in *Alaska National* argued that the phrase "business or personal affairs" contained in the "Employees As Insureds" Endorsement was ambiguous and should be construed to include the employee's travel back to his work/residence location.  *Id*. at 4.  The court rejected this argument, holding that the "business or personal affairs" language was not ambiguous.  *Id*. at 4-5.

> [Plaintiffs] argue that because of the nature of his employment with Wards Cove [the employer], Bryan [the driver] was in the business or personal affairs of Wards Cove during the accident. [Plaintiffs] point out that Bryan was employed at a remote site and that having the motorcycle available to him was of substantial benefit to Wards Cove because it allowed him to leave the premises for recreational activities and then return to Wards Cove's property on short notice if necessary, which was required under his contract of hire.  Plaintiffs also focus on Bryan's status as a 24-hour on call employee. <u>Under this interpretation, Bryan would be acting in the business and personal affairs of his employer during his entire employment at Wards Cove</u>. This is simply not a reasonable interpretation of the insurance policy. If the parties intended such expansive coverage, the parties would have explicitly covered Bryan as an insured under the policy.

104 P.3d at 5-6 (emphasis added).  The court held that it is not

reasonable to interpret the policy language to provide coverage at all times while employed by Wards Cove "because it would render the qualifier in the 'business or personal affairs' [clause] meaningless."  *Id.* at 6.  The court emphasized that the employee was not responding to a call from his employer or in any way attending to the actual business affairs of his employer at the time of the accident.  *Id.*  In doing so, the court observed that the employee was "returning home after a night of recreational drinking."  *Id.*

*Alaska National* is distinguishable from this case.  Under the interpretation advanced by the plaintiff in Alaska National, the employee would have been covered by the "business and personal affairs" clause 24 hours a day regardless of the nature of his activities.  Indeed, the plaintiff in Alaska National argued his employer's liability policy should cover his return to his worksite, which he also used as a residence, after a personal, social outing to various bars after work hours under the "business or personal affairs" clause.  In contrast, the interpretation advanced by Defendants in this case limits Mrs. Hughes' coverage to her commute to and from work and any time she uses her personal vehicle during the day to perform activities for Gateway.

Plaintiff next cites *Burke v. Thibodeaux*, 726 So.2d 65 (La. App. 1998), which involved a policy with the identical "Employee as Insureds" endorsement.  In that case, the plaintiff advanced a nonsensical interpretation of the same policy language at issue here that would have rendered any employee a covered insured whenever driving a non-employer owned vehicle for reasons totally

21

unrelated to the company's affairs. *Id*. (Plaintiff contended the phrase "covered auto" meant an auto that was not owned <u>for the purpose of</u> the employer's business or personal affairs, or hired or borrowed for such purposes. This effectively would have brought any auto used by the employee but not owned by the employer within the reach of the "business or personal affairs" clause.)  The court found this proposed interpretation to be "ludicrous," reasoning that the "business or personal affairs" language required that an employee drive a non-owned auto "while in the pursuit of" the employer's "business or personal affairs." *Id*. at 67.

> Any other interpretation would be a strained enlargement of the provisions beyond what is reasonably contemplated by the terms of the policy and would achieve an absurd conclusion. As [the insurer] states, plaintiffs' interpretation would result in coverage for all employees when they were on their own time. We do not think the insurance company or employer intended that result.

*Id*.

Defendants do not advance such an expansive reading of this Policy.  They only assert that Mrs. Hughes was a covered insured during her commute, not on her solely personal time, because Hughes Towing sometimes required her to run company errands during her commute or during the workday in her own vehicle. Further, the *Burke* court only determined that the policy language was not unambiguous in that it did not reach so far as to include coverage for <u>any</u> employee-driven auto not owned, hired or borrowed by the employer, as plaintiffs had argued. The court did not otherwise define the phrase "business or personal affairs" or suggest what specific activities the phrase included.  In fact,

22

the plaintiffs in *Burke* never argued that the employee was using the automobile in the employer's "business or personal affairs." As such, the case is not particularly helpful in evaluating whether Mrs. Hughes' commute is covered.

Plaintiff also cites *Hurlburt v. Indemnity Insurance Company of North America*, 289 A.D.2d 760 (N.Y.A.D. 2001). In that case, the employee, an emergency medical squad member, was off duty and driving her own personal vehicle for social purposes when she learned through a social encounter that a medical emergency had occurred nearby. She proceeded to drive to the scene to offer assistance. While en route, she was involved in an accident. She sought a judicial declaration that she was covered by her employer's policy, which stated that "any employee of [the Squad] is an 'insured' while using a covered 'auto' you don't own, hire or borrow in your business or your personal affairs." *Id.* at 761.

The parties in *Hurlburt* in fact <u>agreed</u> that there was "no ambiguity" in the contract language. They further agreed prior to trial that "a factual determination was necessary to answer the question of whether [the employee's activities at the time of the accident] were in furtherance of the business affairs of the Squad." *Id.* In affirming the trial court's determination that the employee was <u>not</u> acting in furtherance of the Squad's business at the time of her accident and therefore was not an insured under the policy, the court specifically focused on the following factual bases for the trial court's conclusion:

> First, the record makes clear that plaintiff was not on duty for the Squad on the morning of January 1, 1992, had not been contacted by a dispatcher to respond to

the first accident and had not even heard about that accident via the portable radio that she had been issued by the Squad (she was not even carrying her radio that morning). Moreover, she made no attempt to contact the dispatcher to notify her that she was en route to the accident and did not activate the green courtesy light mounted in her vehicle at any time. Additionally, she was admittedly "under the influence of alcohol" at the time, having imbibed at a New Year's Eve party that she herself had hosted.

Perhaps most problematic is the record evidence that plaintiff emphatically denied that she was responding to the accident as a Squad member at a special meeting of the Squad called in early January 1992 specifically to explore the circumstances under which she had responded to the first accident. According to David Downing, the Squad captain at that time, plaintiff stated, in response to allegations that she was driving under the influence of alcohol that morning and thus responding to an accident in violation of the Squad's response policy, that "she was not responding to the scene of the [first] motor vehicle accident as a member of the ... Squad" and therefore her conduct that morning "wasn't any of [the Squad's] business." According to Downing, in light of plaintiff's statement, no disciplinary action was taken against her by the Squad. Four other meeting attendees similarly testified. Plaintiff also made similar denials to friends.

Given these facts, we find that Supreme Court appropriately concluded that plaintiff was not acting in furtherance of the Squad's business at the time that she was proceeding to the first accident and therefore is not an additional insured under the Indemnity policy. <u>To countenance the contention of plaintiff and Hunsdon that plaintiff was acting in the furtherance of the Squad's business simply because she took it upon herself to respond to an accident would make all Squad members additional insureds under the policy so long as they too make a unilateral decision to proceed to the scene of a call where assistance is not expected, requested or perhaps even needed. Such an interpretation of the policy would certainly not foster the reasonable expectations of Indemnity and the Squad when they entered into this agreement.</u> [Citations.]

*Id.* at 761-62 (emphasis added).

*Hurlburt* is not strong authority for Plaintiff's contention that the policy language is unambiguous, because there, the parties stipulated that the language was unambiguous. (Ambiguity

24

was not an issue decided by the *Hurlburt* court.)  The *Hurlburt* court explained that it would not be reasonable to find that the policy language covered an individual who made a unilateral decision to proceed to the scene of a call.  Plaintiff suggests that Mrs. Hughes' commute to work similarly should be deemed outside the scope of the policy provision because she was not asked to perform any business functions during the trip in which the accident occurred.  However, Defendants maintain that Mrs. Hughes was expected to drive her car to work so that it would be available for her to use throughout the day for the business, as well as before arriving at work or after leaving for the day.  In this way, Mrs. Hughes' commute is different from the rescue worker's unilateral decision to drive to the scene of the accident.

Finally, Plaintiff cites *Pham v. Hartford Ins. Co.*, 419 F.3d 286 (4th Cir. 1995), as support for the argument that the phrase "business or personal affairs" is clear and unambiguous.  The employee in *Pham* was involved in a car accident while driving a colleague late at night back to the apartment complex their employer had rented for its workers on a temporary, out-of-state job site.  *Id*. at 287-88.  The plaintiff in that case argued that the words in the phrase "business or personal affairs" related to "covered auto" and not to the use of the auto in the employer's "business or personal affairs."  *Id*. at 290.  There the court stated:

> In our opinion, such is a strained construction because it omits the plain requirement of using the auto in the business or personal affairs of [the employer]. The plain meaning of this provision of the Broad Form endorsement is clear and unambiguous. Reasonably

> construed, it does not lend itself to the
> intrepretation of the plaintiffs. Under the Broad Form
> Endorsement, an employee is covered, even in an auto
> that [the employer] does not own, hire or borrow, so
> long as the employee is engaged in [the employer's]
> business or [the employer's] personal affairs.

*Id.*

*Pham* is also distinguishable.  The *Pham* plaintiffs did not allege that the employee used the non-owned auto in the employer's business or personal affairs and, in fact, argued that the non-owned auto did not need to be used by the employee in the employer's business or personal affairs to be covered.  They claimed that a car was covered as a non-owned auto if it was not owned, hired or borrowed <u>for</u> the employer's business or personal affairs.  The accident in *Pham* occurred while the employee was off-work and after he had gone out drinking and socializing with a colleague.  The *Pham* court declared that the non-owned auto driven by an employee is covered <u>only while used in</u> the employer's business or personal affairs.  Here both parties agree that the non-owned auto must be used in the employer's "business or personal affairs" but disagree as to how to interpret and apply this phrase and, specifically, differ over whether Mrs. Hughes' daily commute to and from work is included as part of Gateway's "business or personal affairs."

Under California law, an ambiguity must be found to exist whenever the policy language is "capable of two or more constructions, both of which are reasonable."  *MacKinnon,* 31 Cal.4th at 648.  Under this general framework, the four cases discussed above – *Alaska National, Burke, Hurlburt*, and *Pham* – are not dispositive of the question of ambiguity, despite that

they all either find or assume that the policy language "business or personal affairs" is unambiguous.  All of these cases involved situations where the car accident occurred while the employee was engaged in individual social pursuits.  None address the circumstance where an employee is involved in an accident during her commute, as is the case here.  As such, these cases simply offer support, if somewhat attenuated, for a finding that Plaintiff's interpretation, which would exclude Mrs. Hughes commute from coverage, is one reasonable interpretation.

The context and circumstances surrounding the Lincoln General Policy also lend support to the notion that Plaintiff's interpretation is a reasonable one.  Although it is disputed whether the original policy application continues to apply to the 2005 renewal policy in operation at the time of the accident, Plaintiff argues that it views the endorsement clause in light of Gateway's response in the original application that no employees regularly use their personal vehicles in the business.  Because the endorsement expanded coverage under the Lincoln General Policy to include employees as insureds specifically when they drive non-owned autos, Plaintiff argues such coverage is not consistent with Defendants' claim that a daily work commute is included under the endorsement.  According to Plaintiff, if Defendants intended Mrs. Hughes' commute to and from work five days a week to be covered under the policy, they should have listed her personal vehicle in the policy's Schedule of Vehicles, not under a clause which applies under only more limited conditions, and added Mrs. Hughes as a Scheduled Driver.  This line of reasoning provides additional support for the

27

1   reasonableness of Plaintiff's interpretation.  The inquiry then

2   turns to whether Defendants' interpretation is also reasonable.

3       Defendants assert that the endorsement should be interpreted

4   to include coverage for Debrah's use of her personal vehicle

5   during normal work days during normal work hours, including her

6   everyday commute, whether or not she ran errands for the business

7   during a particular commute.

> [A]s one of the two owners and President of GATEWAY,
> and because her personal activities related to and
> involved GATEWAY's personal activities, and because
> GATEWAY understood and expected DEBRAH to be available
> from the moment she left home for work until she
> returned home at the end of the day, GATEWAY understood
> DEBRAH's use of her personal vehicle to get to and from
> work each day would be covered under the LGIC policy.

12  (Doc. 31 at 11.)

13      In support of this interpretation, Defendants point out that

14  the term "personal" is defined in Webster's Ninth New Collegiate

15  Dictionary to mean "of, relating to, or affecting a person..."

16  In this case, Defendants assert that the "person" is Gateway and

17  that Mrs. Hughes' use of her vehicle to get to and from work "did

18  relate to and affect" Gateway and its business.  (*Id*. at 12.)

19  Thus, Defendants maintain, under a plain reading of the term

20  "personal affairs," Debrah's use of her vehicle to get to and

21  from work as an owner of the business involved the "personal"

22  affairs of <u>Gateway</u>.

23      This interpretation of the phrase "business or personal

24  affairs" is a reasonable one.  Defendants contend that as an

25  owner of Gateway who at times ran various errands for Gateway

26  during the day and during her commute, Mrs. Hughes' commute to

27  work in her personal vehicle was related to and affected

28                                   28

Gateway's personal affairs.   They point out that they specifically paid extra for the endorsement because Mrs. Hughes used her car in  Gateway's business or personal affairs. Plaintiff does not dispute the definition of "personal" offered by Gateway nor does it offer an alternative definition.   It is undisputed that the Lincoln General Policy did not provide a definition of the phrase "business or personal affairs."   There is no difficulty in understanding that a corporation conducts "business."   What "personal" affairs a corporation has is not addressed by either party, despite the court's question to them at oral argument.   Does "personal" mean "non-business" and if so, does it mean any and every activity of the corporation so that the definition swallows any limitation on purpose of the use? Neither party provides any meaningful information on the history, meaning or intent of the phrase "personal affairs" in the supplemental briefing as requested at the January 29, 2007 initial hearing.

Plaintiff repeatedly asserts that to qualify for coverage under the endorsement, the employee must be engaged in work-related activity while driving a non-owned auto.   This assertion ignores the term "personal affairs" that is included in the endorsement and insists the employee must only be engaged in business-related activities.[4]   Under the policy's own terms,

---

[4] Plaintiff suggests that Gateway's position would result in Mrs. Hughes always being entitled to coverage under the Lincoln General Policy, whenever she uses her car for any purpose, because Gateway points to Mrs. Hughes' use of her car to run business errands during the day and asserts that she is always "on-call" to attend to Gateway's affairs.   As such, Plaintiff declares that a construction in favor of Gateway would

however, coverage is extended to employees driving non-owned autos while engaged in Gateway's "business or personal affairs." Coverage under this clause exists when Mrs. Hughes is engaged in Gateway's business affairs <u>or</u> Gateway's personal affairs while driving a covered auto.

California authority regarding the "going and coming" rule also supports Defendants' position.  As discussed above, the "going and coming" rule generally provides that an employee is not regarded as acting within the course and scope of employment while going to or coming from work.  *See Ducey v. Argo Sales Co.*, 25 Cal.App.3d 707, 722 (1979).  Even though the "going and coming" rule does not have <u>direct</u> application to this case because it expresses an interpretation of the phrase "course and scope of employment," rather than the specific policy language applicable here ("business or personal affairs"), Defendants highlight an exception to the going and coming rule.

Under that exception, when an employee's duties include traveling during business and the employee is not required to report to a specified location to start employment, the going and coming rule does not apply.  *See e.g., Richards v. Metropolitan Life Ins. Co.*, 19 Cal.2d 236, 243-244 (1941); *Fenton v. Industrial Acc. Com.*, 44 Cal.App.2d 379, 383 (1941); *Dillon v.*

"eviscerate the need for personal auto insurance...."  (Doc. 56 at 11.) Here again Plaintiff ignores the fact that the issue at hand is a much narrower one, whether Mrs. Hughes' commute to and from work is covered under the phrase "business or personal affairs."  Defendants do not argue that Mrs. Hughes should be covered under the Lincoln General Policy whenever she drives her car; rather, they claim the policy covers her commute because when she commutes in her personal vehicle she is using her car (the non-owned auto) in Gateway's "business or personal affairs."

30

*Prudential Ins. Co.*, 75 Cal.App. 266, 271 (1925.) In *Richards*, the California Supreme Court held:

> It is said that when a workman is engaged in traveling from place to place without the necessity of reporting at a particular place of business, he may be deemed to enter upon his employment when he leaves his home to proceed to the first place to which his duty calls him, when [the] employee is not required to report for work at any particular place but travels in the course of his duties, since in such case he immediately enters upon his employment when he leaves his home to proceed to the first place to which duty calls him.

19 Cal.2d at 243-44 (internal quotations omitted). In *Richards*, an insurance salesman worked both at his office and in the field. He was not required to report to the office before starting work and he regularly made sales or service calls before reporting to the office. One morning, while he was on his way directly from his home to his office, he had an accident. The *Richards* court determined that a trier of fact could find that he was acting within the scope of his employment at the time of the accident because he could perform his duties either in the office or outside of the office and he did not have to report to the office first before starting to perform his duties. Under such circumstances, because there was no requirement that he should first report to the office before he began to perform his duties, he was deemed to have entered upon his duties when he left his home on the day of the accident. *Id*. at 243.

Similarly, in *Huntsinger v. Glass Container Corp.*, 22 Cal.App.3d 803, 809 (1972), where an employee made occasional customer calls before arriving at work or on his way home, his commute to work was a benefit to his employer and came within the course and scope of his employment.

31

> [W]hen a business enterprise requires an employee to drive to and from its office in order to have his vehicle available for company business during the day, accidents on the way to or from the office are statistically certain to occur eventually, and, the business enterprise having required the driving to and from work, the risk of such accidents are risks incident to the business enterprise.

*Id*. at 810.

The same result was reached more recently in *Singh v. Board of Retirement*, 41 Cal.App.4th 1180 (1996), where the plaintiff was injured while traveling directly to work.  The court found that his injuries were compensable by his employer under the exception to the going and coming rule for employees whose vehicle use provides an incidental benefit to their employer. Specifically, the plaintiff was a city inspector whose duties included occasionally making inspections before he arrived at the office.  The plaintiff was also a member of an emergency team for which he was to be available twenty four hours a day.  The *Singh* court reasoned:

> A well-known exception to the going and coming rule arises where the use of the car gives some incidental benefit to the employer.  Thus, the key inquiry is whether there is an incidental benefit derived by the employer. The question is not who owns the vehicle or whether the employee receives reimbursement by the employer for the vehicle or whether the employee performs a personal errand while driving home.

*Id*. at 1187 (citations omitted).  Even though *Singh* was injured on a day he was traveling directly from his home to his office, his injuries were within the course and scope of his employment because his vehicle use provided an incidental benefit to his employer.  *Id*. at 1186-1188.

Although these cases do not concern the policy language at issue in this case, they stand for the general proposition that

32

an employee's commute may be included within the course and scope of business activities if the employee is required to occasionally perform job duties during his or her commute or if the vehicle provides incidental benefit to the employer.  Here, the undisputed evidence suggests that Mrs. Hughes' vehicle falls squarely within this line of authority.  None of the cases cited by Plaintiff regarding the more specific policy language "business or personal affairs" deals with accidents that occurred during a commute.

The concept of "personal affairs" of an entity is anomalous because an entity, although a "person" in the eyes of the law, does not engage in "personal activities."  This creates ambiguity.  Absent authority to the contrary, it cannot be concluded that Defendants' interpretation of the policy language is unreasonable.  Because the Plaintiff's interpretation is also a reasonable one, the Lincoln General policy language is "susceptible to two or more reasonable constructions."  *E.M.M.I.,* *32 Cal.4th at 470.*  For purposes of this motion, then, the policy language "business or personal affairs" of the named insured Gateway is ambiguous as to whether or not Mrs. Hughes' commute is covered by the policy language.  Where policy language has no "clear and explicit meaning," ambiguity is "resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them at the time of formation." *Id.*

Neither party has offered evidence or addressed their respective understanding of the term at the time of contracting. If no clear and explicit meaning of the policy language is

33

revealed and it is uncertain what the insurer believed about the insured's understanding of the term at the time the policy was obtained, any ambiguities are resolved in favor of the insured and against the party who caused the uncertainty to exist, the insurer. *Foster-Gardner*, 18 Cal.4th at 868.   These are questions of fact for the trier of fact. Accordingly, the ambiguous term "business or personal affairs," if construed in Gateway's favor, leaves open the issue of the parties' reasonable expectations when contracting for such coverage.

## V.   CONCLUSION

Plaintiff's motion for summary judgment on the duty to defend claim is DENIED.

IT IS SO ORDERED.

Dated:   __October 27, 2007__                  _____ /s/ Oliver W. Wanger _____
                                         UNITED STATES DISTRICT JUDGE