**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LINCOLN GENERAL INSURANCE CO.,** | **1:06-cv-01143 OWW SMS** |
| **Plaintiff,** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **v.** | |
| **GATEWAY SECURITY SERVICES, INC., et al.,** | |
| **Defendants.** | |

   This case came before the court for trial on March 4, 2008 in Courtroom 3, the Hon. Oliver W. Wanger presiding, sitting without a jury by stipulation.  This case was submitted on trial briefs, exhibits and stipulated facts.  On March 4, 2008, the parties presented oral arguments.  Pursuant to Fed. R. Civ. P. 51, the parties submitted proposed Findings of Fact and Conclusions of Law.

   Plaintiff Lincoln General Insurance Co. ("LGIC" or "Lincoln General") was represented by Andrew R. Shalauta, Esq.  Defendants Gateway Security Services, Inc. dba Hughes Towing and Auto Wrecking ("Gateway"), Debrah Hughes, and Donald Hughes were represented by James H. Wilkins, Esq.  Defendants Ramon Devine and Lucinda Devine were represented by Todd Reeves, Esq.

1

The following findings of fact and conclusions of law are entered pursuant to Fed. R. Civ. P. 52(a).  To the extent that any finding of fact can be interpreted as a conclusion of law and vice versa, it shall be treated as such.

## BACKGROUND

This is a declaratory relief action brought by Plaintiff Lincoln General Insurance Co. ("LGIC" or "Lincoln General") concerning its duty to indemnify the claims alleged in an underlying state court personal injury action, *Devine v. Hughes*, Kings County Superior Court, Case No. 06C0015 ("Underlying Action").  The underlying action alleges that, on July 18, 2005, Mr. Ramon Devine ("Devine") suffered injuries in a motor vehicle accident caused by Debrah Hughes during the course of her employment for Gateway Security Services, Inc.  Also named as defendants in the underlying action are Debrah Hughes and Donald Hughes, co-owners and employees of Gateway, which does business as Hughes Towing.

At the time of the accident, Mrs. Hughes was commuting to work in her personal vehicle, a Cadillac.  At the time, Gateway's vehicles were insured by Lincoln General under a business auto insurance policy which extended coverage by way of endorsement to employees using autos not owned by Gateway in Gateway's "business or personal affairs."  Lincoln General seeks a declaration that it has no duty to indemnify Gateway or Mrs. Hughes in the underlying action on the ground that the policy does not cover Mrs. Hughes's use of her personal vehicle during her commute to and from work.

On August 28, 2006, Lincoln General filed this lawsuit

alleging both a declaratory relief claim, with respect to its duty to defend and indemnify Gateway, and a rescission claim on grounds that Defendants made misrepresentations in the insurance applications.   On January 17, 2008, Lincoln General stipulated to dismissal with prejudice of its claim for rescission, with each party to bear its own costs.   At the same time, Lincoln General withdrew its claim that it had no duty to defend Gateway against the claims asserted in the underlying action.   The sole issue remaining for determination is whether, under Lincoln General's policy, it has any duty to indemnify Gateway or Mrs. Hughes for the claims asserted in the underlying action.

## FINDINGS OF FACT

1. On January 26, 2006, Ramon Devine and Lucinda Devine ("Underlying Plaintiffs") filed suit against Debrah Hughes, Donald Hughes, Gateway Security Services, Inc., dba Hughes Towing & Auto Wrecking, Corcoran Auto Dismantling, and Hughes Auto Wrecking and Towing, Inc., in the action entitled *Devine et al. v. Hughes, et al.*, Kings County Superior Court, Case No. 06C0015 ("Underlying Action").

2. The complaint in the Underlying Action alleges that Ramon Devine, on July 18, 2005, suffered injuries as the result of a motor vehicle accident caused by Defendant Debrah Hughes during the course of her employment with Gateway ("Underlying Action Complaint").

3. Lincoln General issued Business Auto Coverage Policy No. LTP101263-02 effective May 11, 2005, to May 11, 2006, to named insured Gateway Security Services, Inc. dba Hughes Towing &

Auto Wrecking ("Gateway"). This policy is referred to as the "Lincoln General Policy." The written terms of this policy of insurance are not disputed, except as to the meaning and application of the Employees as Insureds endorsement.

4. The Underlying Action Complaint was tendered to Lincoln General under the Lincoln General Policy.

5. The parties agree that Lincoln General accepted defense for the named insured Gateway in the underlying action under reservation of rights. Lincoln General appointed defense counsel, Terry Cassidy (of Porter, Scott, Weiberg & Delehant), who defended the named insured and participated with the insured corporation owner's personal auto carrier, GMAC Insurance Company, in providing Gateway with a defense under reservation of rights.

6. The Underlying Action was resolved by a stipulated judgment, wherein the underlying Plaintiffs and Defendants agreed to a judgment of $1.1 million, and the underlying Plaintiffs (Devines) agreed not to execute on the judgment until all of the claims and issues raised in this action have been finally adjudicated, through all available appeals.

7. Liability coverage was furnished to Gateway under Business Auto Coverage Form CA 0001 (edition 10/01), which provides a combined single liability limit of $1 million in connection with "Covered Autos" as designated on the policy declarations.

8. Liability coverage is furnished for "Covered Autos" under "Symbols 7, 8, and 9," which provide coverage, respectively, for "Specifically Described Autos," "Hired Autos," and "Non-Owned

Autos" while used in the named insured's business.

9. The Lincoln General Policy provides insurance coverage, in part, as follows:

**SECTION I — COVERED AUTOS**

**Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages.  The following numerical symbols describe the "autos" that may be covered "autos".  The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".**

**A.    Description of Covered Auto Designation Symbols**

**\*\*\***

| [Symbol 9] | Nonowed "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business.  This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company), or members of their households but only while used in your business or your personal affairs. |
|---|---|---|

**SECTION II — LIABILITY COVERAGE**

**A.    Coverage**

**We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".**

**\*\*\***

**SECTION V—DEFINITIONS**

**\*\*\***

**B.    "Auto" means a land motor vehicle, "trailer" or semitrailer designed for travel on public roads but does not include "mobile equipment".**

**\*\*\***

**F.    "Employee" includes a "leased worker".  "Employee" does not include a "temporary worker".**

**G.  "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage.  Except with respect to Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.**

**\*\*\***

**J.  "Loss" means direct and accidental loss or damage.**

**\*\*\***

(Doc. 102, Exhibit D at LGI0020-29.)


    10. The following endorsement is part of the policy and

modifies the "Who Is An Insured" provision:

**THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY.**

**EMPLOYEES AS INSUREDS**

**This endorsement modifies insurance provided under the following:**

> **BUSINESS AUTO COVERAGE FORM
> MOTOR CARRIER COVERAGE FORM
> TRUCKERS COVERAGE FORM**

**With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.**

**The following is added to the Section II—Liability Coverage, Paragraph A.1. Who Is An Insured Provision:**

**<u>Any "employee" of yours is an "insured" while using a covered "auto" you don't own, hire or borrow in your business or your personal affairs</u>.**

(*Id.* at LGI0044.)


    11. The Cadillac involved in the accident is not owned by

the named insured nor is it a scheduled vehicle on the Lincoln

General Policy.

    12. On January 18, 2006, Debrah Hughes gave an Examination

Under Oath ("EUO") before a certified shorthand reporter regarding the accident that took place on July 18, 2005, appearing with her attorney, Klint James McKay.

13. Mrs. Hughes was commuting on her normal route from home to work at Gateway at the time of the underlying accident.

14. Mrs. Hughes was driving her personal vehicle to work at the time of the accident.

15. The Gateway Defendants have never scheduled any personal vehicles used by Mrs. Hughes to conduct Gateway's outside business errands.

16. The registered owner of the Cadillac involved in the accident is Debrah Hughes or Donald Hughes, and not the named insured corporation.

17. Just before the accident, Mrs. Hughes made a brief stop at the Food King grocery store parking lot in order to take a personal call from her daughter on a cell phone.

18. Mrs. Hughes did not make any other stops between her home and the Food King parking lot.

19. Mrs. Hughes intended to drive straight to work after completing the personal call, and to not make any other stops.

20. This was Mrs. Hughes's initial commute to work on the day of the accident.

21. The subject accident occurred as Mrs. Hughes continued on her driving commute to work after the personal call with her daughter.

22. Debrah Hughes did not make any other stops between her home and the Food King parking lot and had not intended to make any other stops before arriving at work.

7

23. Although Debrah Hughes was not running an errand for Gateway at the time of the accident, as was her routine during normal business hours, she was available to do so.

24. Following the accident, Mrs. Hughes drove straight to work.

25. Mrs. Hughes has no specific set hours of work but is generally at work five days a week from 11 a.m. to 4 p.m.

26. Mrs. Hughes testified that at various times, as part of her work duties, she drove her own personal car to make bank deposits, go to the Post Office, buy cleaning supplies for the business, and to get lunch for employees.

27. Five vehicles and one trailer were listed under the Lincoln General Policy at the time of the accident.

28. A service vehicle, a 1989 Toyota pick-up truck, is listed on the Schedule of Vehicles which is part of the Lincoln General Policy.

29. The Toyota pick-up serves as Gateway's service vehicle.

30. Gateway has always maintained a service vehicle to run outside business errands.

31. The Cadillac involved in the accident was never reported to Gateway's insurance agent, Robert Storelee.

32. The Cadillac involved in the accident was never reported to Lincoln General.

33. Mrs. Hughes has always been entitled to use the service vehicle pick-up, instead of her own personal automobile, to conduct business errands.

34. Gateway was aware that it could change vehicles and drivers on the Lincoln General Policy at any time.

8

35. The service vehicle pick-up truck was available to the employees to run outside business errands.

36. Bryan Burnes was responsible for obtaining insurance for Gateway.

37. Bryan Burnes, Donald Hughes and Debrah Hughes never reviewed any marketing materials for the Lincoln General Policy.

38. Gateway's person most knowledgeable regarding Gateway's insurance policies, Bryan Burnes, does not recall whether or not he had ever reviewed the terms of the Lincoln General Policy.

39. Donald Hughes is the Vice President and manager of Gateway. Mr. Hughes has been the sole manager for the past twenty years.

40. Gateway does not have any written guidelines, manuals or other writings which discuss the reimbursement for employees' use of their personal vehicles.

41. Gateway does not have any written guidelines, manuals or other writings which require Mrs. Hughes to use her personal vehicle for Gateway's business errands.

42. Gateway does not maintain any written employment agreements.

43. Mrs. Hughes and Gateway do not have any writing that sets forth the terms and conditions of her employment.

44. Mrs. Hughes performs personal banking transactions while performing bank transactions on behalf of Gateway.

45. Gateway does not maintain any written documentation which distinguishes between the time spent by Mrs. Hughes on personal banking transactions and business transactions for Gateway.

46. Donald Hughes does not know how often Mrs. Hughes makes bank deposits on behalf of Gateway.

47. Bryan Burnes, Gateway's person most knowledgeable concerning employees' use of personal vehicles, does not know how often Mrs. Hughes makes bank deposits for Gateway.

48. Gateway and Mrs. Hughes do not maintain any written record of how often Mrs. Hughes delivers parts, goes to the Post Office, shops for office supplies, gets lunch, or makes bank deposits, on behalf of Gateway.

49. Mrs. Hughes purchases office supplies for Gateway, and personal supplies, during the same transaction using the same Gateway credit card.

50. Mrs. Hughes performs personal errands at the Post Office while she delivers mail on behalf of Gateway.

51. Gateway and Mrs. Hughes do not maintain any written record of how much time is spent on personal errands during business errands for Gateway.

52. Gateway provides both Mrs. and Mr. Hughes with company credit cards.

53. Gateway does not provide any written guidelines, manuals or other writings restricting the use of company credit cards for personal and business transactions.

54. Gateway does not restrict Mrs. Hughes from using company credit cards for personal transactions.

55. Gateway does not provide any limits on how much Mrs. Hughes can spend on gas for personal use with the company credit card.

56. Mrs. Hughes uses the company credit card to pay for gas

10

for her personal vehicle for personal use and business use.

57. Mrs. Hughes is allowed by Gateway to purchase personal and business items with the company credit cards.

58. Gateway and Mrs. Hughes do not maintain any sort of writing specifying what items are purchased for business or personal use on company credit cards.

59. Mr. and Mrs. Hughes do not reimburse Gateway for items purchased on the company credit cards which are for personal use.

60. Mrs. Hughes cannot distinguish in any credit card statement produced by Gateway in this action, what items pertain to personal items or business items.

61. Gateway provides Mrs. Hughes with a company cell phone.

62. Mrs. Hughes uses her cell phone for business and personal calls and is permitted by Gateway to do so.

63. There is no limit on how often Mrs. Hughes can use the cell phone provided by Gateway for personal calls.

64. Mrs. Hughes has never reimbursed Gateway for personal calls.

65. Mrs. Hughes does not maintain any record of how often she uses her cell phone for business or personal use.

66. Mr. Hughes also uses his company call phone for business and personal use. Mr. Hughes does not reimburse the company for the personal use of his cell phone. There is no limit on how often Mr. Hughes can use his cell phone for personal calls.

67. Gateway provides Mr. Burnes with a cell phone. Mr. Burnes uses his cell phone for business and personal use and has never reimbursed Gateway for personal calls.

68. Gateway also provides company cell phones to nonemployees, such as Marla Hughes, Candice Burnes, and Bryan Burnes, Jr. (Bryan Burnes' son). None of the non-employees have ever reimbursed Gateway for their personal calls.

69. Gateway does not maintain any written guidelines, manuals or other writings which discuss employees' use of the company cell phone.

70. Mrs. Hughes does not reimburse Gateway for maintenance associated with the use of her personal vehicles.

71. Gateway and Mrs. Hughes do not maintain any written record or log demonstrating how much is spent on the maintenance of the Hughes' personal vehicles.

72. The Lincoln General Policy does not contain a definition of "business or personal affairs."

73. The Gateway Defendants never asked Lincoln General whether Debrah Hughes' use of her personal vehicle to get to and from work would or would not constitute activities in connection with the "personal affairs" of Gateway.

74. Gateway first became an insured with Lincoln General in the Spring of 2003.

75. With the assistance from R.A. Storelee Insurance Agency, and on or about April, 2003, Gateway submitted an application for towing insurance to Lincoln General, dated April 9, 2003.

76. As a result of Gateway's April 9, 2003 application, Lincoln General issued Gateway a liability policy for the towing and auto wrecking business, Policy No. LTP101263 with an effective policy period of May 11, 2003, through May 11, 2004.

12

77. With the assistance from R.A. Storelee Insurance Agency, Gateway obtained a renewal liability policy from Lincoln General, for the policy periods May 11, 2004, to May 11, 2005, (Policy No. LTP101263-01) and May 11, 2005, to May 11, 2006, (Policy No. LTP101263-02) hereinafter referred to as "Renewal Policies."

78. At no time prior to the July 18, 2005, motor vehicle accident did anyone from Lincoln General explain to Gateway that Debrah Hughes' use of her personal vehicle to get to and from work would not constitute activities in connection with the "personal affairs" of Gateway.  The subject was never discussed.

79. After being served with the underlying lawsuit, and tendering Gateway's defense to Lincoln General, Gateway, through its counsel, received a letter dated March 28, 2006, from Lincoln General's coverage counsel, Clark Burnham, that states:

> It is very clear from the two statements that we have of Mrs. Hughes that she was not acting within the course and scope of her employment at the time of the accident and therefore the Lincoln General policy should not be called upon to indemnify the plaintiffs. The allegations of the complaint, however, clearly trigger the policy, for if the jury were to disbelieve the actual facts as set forth in Mrs. Hughes' statement and find that she was within the course and scope of her employment, she would be deemed an insured under the Lincoln General policy.

80. As president of Gateway, in addition to running errands for the business, Debrah Hughes was the licensed dismantler and vehicle verifier for Gateway.

81. The person most knowledgeable regarding underwriting at Lincoln General was not aware of any practice of Lincoln General to provide written explanation of the term "business or personal affairs" to potential policyholders.

13

82. The Insurance Professionals have marketing, underwriting, binding and issuing policy authority from Lincoln General.

83. Bryan Burnes never read the Lincoln General Policy prior to purchasing it or the Renewal Policies.

84. Debrah Hughes never read the Lincoln General Policy prior to purchasing it or the Renewal Policies.

85. Donald Hughes never read the Lincoln General Policy prior to purchasing it or the Renewal Policies.

86. Lincoln General does not possess documents which discuss the phrase "business or personal affairs" as used in the Lincoln General Policy and Renewal Policies.

87. Gateway submitted no evidence that its officers or agents intended to pay for an endorsement in the Lincoln General policy to cover employees while commuting to or from work.

88. Gateway submitted no evidence that its officers or agents intended to pay or ever paid for an endorsement in the Lincoln General policy to cover Debrah Hughes while commuting to or from work.

89. Donald and Debrah Hughes never understood that "personal affairs," as used in the Lincoln General Policy, included Debrah's use of her personal vehicle to commute to and from work. (Doc. 102, Ex. J at 72-75; Ex. K at 105-08.)

90. Donald and Debrah Hughes never understood that "personal affairs," as used in the Lincoln General Policy, included Debrah's use of her personal vehicle to commute to and from work even if she also ran outside business errands for Gateway. (Doc. 102, Ex. J at 72-75; Ex. K at 105-08.)

14

91. Gateway never understood that "personal affairs," as used in the policy, included Debrah's use of her personal vehicle to commute to and from work.

92. Debrah Hughes did not perform any work duties, including any errands on behalf of Gateway, that required her to drive outside of the office on the day of the accident nor was she planning to do so.

93. Debrah Hughes did not receive compensation for travel to and from work.

94. An insured service vehicle is and was available on July 18, 2005 for employees, including Debrah Hughes, to use to conduct errands for Gateway.

95. Debrah Hughes is not required to use her personal vehicle to conduct errands for Gateway, nor was she requested to do so.

96. Debrah Hughes used her own vehicle to run errands for Gateway because she found it more comfortable and convenient.

97. Gateway does not reimburse or otherwise pay expenses to Debrah Hughes for the use of her personal vehicle to run errands for Gateway.

98. Donald and Debrah Hughes had no knowledge of the Employees As Insureds endorsement prior to this lawsuit.  (Doc. 102, Ex. J at 72-73; Ex. K at 105.)

99. Donald and Debrah Hughes were not aware of the "business or personal affairs" language in the Lincoln General Policy prior to this lawsuit.  (Doc. 102, Ex. J at 73-74; Ex. K at 105.)

100. Neither Donald Hughes, Debrah Hughes or Bryan Burnes discussed between or among themselves insurance coverage for the

use of personal vehicles in relation to obtaining the Lincoln General Policy prior to purchasing it.  (Doc. 102, Ex. J at 72; Ex. K at 106-08; Ex. L at 65.)

101. Neither Donald Hughes, Debrah Hughes or Bryan Burnes discussed between or amongst themselves insurance coverage for commuting in personal vehicles under the Lincoln General Policy prior to purchasing it.  (Doc. 102, Ex. J at 72; Ex. K at 106-08; Ex. L at 65.)

102. Neither Donald Hughes, Debrah Hughes or Bryan Burnes discussed insurance coverage for commuting in personal vehicles with insurance agent Robert Storelee.  (Doc. 102, Ex. J at 75; Ex. K at 108; Ex. L at 64-65.)

103. Neither Donald Hughes, Debrah Hughes or Bryan Burnes expected Gateway's business auto policy would cover accidents that occur while commuting to and from work in personal vehicles.

## CONCLUSIONS OF LAW

A.  Principles of Insurance Contract Interpretation Under California Law

1.  "[T]he mutual intention of the parties at the time the contract is formed governs [contract] interpretation."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 647-48 (2003)(citing Cal. Civ. Code, § 1636).

2.  If possible, the mutual intent of the parties is to be "inferred...solely from the written provisions of the contract." *MacKinnon,* 31 Cal.4th at 647 (citing Cal. Civ. Code, § 1639).  If an examination of contractual language reveals a "clear and

16

explicit" meaning, this meaning controls.  *Id*. at 647-48.

3.   A court must interpret contractual language in its "ordinary and popular sense," unless terms are "used by the parties in a technical sense or a special meaning is given to them by usage."  *Id*. (citing Cal. Civ. Code, §§ 1638 and 1644). A court must "attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the [] language."  *Id*. at 649.

4.   An insurance policy provision will be considered ambiguous, and therefore without a "clear and explicit meaning," when it is "capable of two or more constructions, both of which are reasonable."  *Id*. at 648.  But, "language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract."  *Id.; Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18 (1995).

5.   The lack of a policy definition does not necessarily render a term ambiguous.  *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal.4th 857, 868 (1998).

6.   It is appropriate to consider extrinsic evidence for the purpose of determining whether an ambiguity exists, *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 39-41 (1968), or to show that the parties attached a special meaning to certain terms, *ACL Tech., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal.App.4th 1773, 1793-94 (1993).

7.   If a provision has no "clear and explicit meaning," ambiguity is "resolved by interpreting the ambiguous provisions in the sense the insurer believed the insured understood them at the time of formation."  *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32

Cal.4th 465, 470 (2004).   A court may consider extrinsic evidence to aid in the interpretation of an ambiguous provision.   *Kavruck v. Blue Cross of Cal.*, 108 Cal.App.4th 773, 782 (2003).

8.   If application of the first two rules still does not eliminate the ambiguity, "ambiguous language is construed against the party who caused the uncertainty to exist."   *E.M.M.I.*, 32 Cal.4th at 470.   This third "contra-insurer rule" as applied to an insurance policy "protects not the subjective beliefs of the insurer but, rather, the objectively reasonable expectations of the insured."   *Id*. at 470-71.   At this stage, "[a]ny ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations."   *Id*. at 471.

B.   <u>Prior Adjudications</u>.

9.   On October 27, 2007, Lincoln General's Motion for Summary Judgment on its declaratory relief claim was denied.   It was determined that the disputed provision of the Lincoln General policy -- "the business or personal affairs" of Gateway – is ambiguous as it is susceptible to two or more reasonable constructions.

10.   "The proper question is whether the provision or word is ambiguous in the context of this policy and the circumstances of this case.   The provision will shift between clarity and ambiguity with changes in the event at hand."   *E.M.M.I.*, 32 Cal.4th at 470.

11.   Given that Mrs. Hughes is an owner and President of Gateway who performed business errands for the corporation as a part of her work duties, Defendants' proposed construction that

18

"personal affairs" of Gateway could include Mrs. Hughes's use of her personal vehicle to commute to and from work was plausible. However, this has not been supported by the evidence at trial.

12.   A court is required to give meaning to every term in the policy, *Union Oil Co. v. International Ins. Co.*, 37 Cal.App.4th 930, 935 (1995), and the phrase "personal affairs" was not defined in the policy.  Although not dispositive, the lack of definition in a policy is evidence of ambiguity.  *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 866-67 (1993).

13.   The fact that this policy contains references to individual persons when the only named insured is a corporation further evidences that the provision lacks a "clear and explicit" meaning.  The Order on Summary Judgment found: "The concept of 'personal affairs' of an entity is anomalous because an entity, although a "person" in the eyes of the law, does not engage in 'personal activities'.  This creates ambiguity."  (Doc. 75 at 33.)  The phrase 'personal affairs' must have some meaning, as it cannot mean the same thing as 'business affairs' under the rules of contract interpretation.

14.   While the provision at issue was found ambiguous at the summary judgment stage, the evidence regarding the expectations of the parties was insufficient and a question of fact remained. The court did not proceed to the second stage of contract interpretation and the objectively reasonable expectations of the insured were not evaluated.

C.    Objectively Reasonable Expectations of Coverage.

15.    An insurance policy is given a meaning consistent with the objectively reasonable expectations of coverage at the time the insurance was purchased.  It is interpreted "in the sense that satisfies the insured's objectively reasonable expectations."  *Buss v. Superior Court*, 16 Cal.4th 35, 45 (1997).

16.    In assessing whether coverage is consistent with the objectively reasonable expectations of an insured, the court interprets the language in context, with regard to its intended function in the policy.  *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992).  This requires consideration of the policy as a whole, the circumstances of the case in which the claim arises, and common sense.  *Id*.

17.    The evidence shows that Gateway purchased this business auto policy from Lincoln General and scheduled five vehicles and one trailer.  Gateway did not schedule Mrs. Hughes's personal vehicle, a Cadillac.  Gateway maintained a service vehicle, a Toyota pick-up, that was scheduled under the policy and used in the everyday activities of the business.  In response to a question in the insurance application, Gateway answered "no" when asked whether employees regularly used their vehicles in Gateway's business.

18.    Mrs. Hughes was employed in the office of Gateway even though she was an officer.  Mrs. Hughes had no set hours at work, but generally was at work from 11 a.m. to 4 p.m. Monday through Friday.  Mrs. Hughes routinely performed errands on behalf of Gateway in her Cadillac, including picking up parts, going to the post office, purchasing supplies and other errands.

19.   While Gateway contends it was expected by the corporation that Mrs. Hughes would use her personal vehicle for these errands, the evidence is contrary.   Mr. Hughes, Gateway's manager for years, testified in his deposition that Mrs. Hughes used her personal vehicle for reasons of comfort.   Bryan Burnes, Gateway's person most knowledgable, testified that Mrs. Hughes used her Cadillac by choice.   Both Mr. Hughes and Mr. Burnes testified that the service vehicle was always available to Mrs. Hughes to use but that she did not choose to use it.

20.   In these circumstances, it is not objectively reasonable for an insured to expect insurance coverage for her commute to and from work in her personal vehicle, five days a week Monday through Friday.   Gateway argues Mrs. Hughes was expected to use her personal vehicle to perform work-related tasks during the workday and implies that the reason Mrs. Hughes drove her car to work was to have it available for such tasks. This ignores the fact that Mrs. Hughes had access to the service vehicle at all times and was not required or expected to use her own car.   Any exposure she had to accident risks during her commute was not due to any business directive or expectation of Gateway but due to her own convenience and to provide a method of transportation to work.

21.   Where the policy procured is a business auto policy and a corporate officer uses her personal vehicle at times for business purposes, it is not objectively reasonable to expect free insurance coverage during work hours on work days, here 11-4 p.m., including her commute to and from work, without scheduling the vehicle under the policy to assure coverage.   Gateway knew

that it had business auto coverage.  Mrs. Hughes and Gateway knew
the extent of the personal auto insurance coverage she maintained
and whether it covered business use.  Because all covered
vehicles under the business auto policy were scheduled and
Gateway knew how to schedule autos for which coverage was
expected and intended, there is no reasonable explanation for the
failure to insure the Cadillac.

22.  Had Gateway or Mrs. Hughes desired coverage under the
business auto policy for Mrs. Hughes's use of her personal car,
the Individual Named Insured endorsement would have been
available to cover such use.  Although neither party addresses
it, this endorsement is used to cover private passenger autos
under a commercial auto policy where the owner needs non-business
coverage and is a sole proprietor or owner of a closely-held
corporation.  For the latter, the owner of the auto must be
listed as a named insured in addition to the corporation.  This
allows the owner to obtain the equivalent of personal auto policy
coverage under the commercial auto form (CA 99 17).

23.  An insured cannot reasonably expect coverage for a
daily commute under a business auto policy when, as here, it did
not require and denied that the employee regularly used her
personal auto in the business.  This is an entirely inconsistent
line of reasoning.  A daily commute, five days a week, is a
"regular use" in the business.

24.  Such a coverage expectation is even less reasonable
where the corporate officer has procured a personal automobile
insurance policy, as did Mrs. Hughes in this case.

25.  The evidence establishes that nobody in any management

22

position at Gateway, a closely held corporation, read the policy or discussed its terms with anyone, either before or after its issuance.  Mrs. Hughes, Mr. Hughes and Bryan Burnes all testified they had not read the policy.  Each further testified that he or she had never seen the endorsement at issue or any of its language, including the "business or personal affairs" language.

26.  None of these three individuals discussed the "business or personal affairs" language at the time of contracting with Gateway's insurance agent, Robert Storelee, or thereafter.  None of the three discussed coverage for commuting to work with Mr. Storelee in relation to obtaining the policy.  The testimony establishes that none of them discussed coverage for commuting with each other or amongst themselves.

27.  It is counterintuitive that Gateway or Mrs. Hughes expected business auto coverage for commuting but never communicated the need or intent to obtain such coverage to their insurance agent, Mr. Storelee, or the person responsible for obtaining insurance for Gateway, Mr. Burnes.  For an expectation of coverage to be objectively reasonable, it cannot be based solely on the uncommunicated and undisclosed beliefs or intent of one person, where no other evidence exists to corroborate such assertions.

28.  While the coverage determination does not depend on the subjective beliefs of the insured, they are nonetheless informative.  An insured cannot reasonably expect coverage for personal commuting under a business auto policy where an individual has not read the policy, was unaware of the endorsement language at issue, and, according to the evidence,

23

never discussed, requested or contemplated auto insurance coverage for commuting in a personal vehicle. *See Cooper Cos., Inc. v. Transcontinental Ins. Co.*, 31 Cal.App.4th 1094, 1109 (1995)("neither [the insured] nor any other insured could have held an objectively reasonable expectation that it was purchasing such coverage in the absence of specific negotiations to acquire it" and finding the Court's interpretation "does not violate any expectation of coverage, whether reasonable or not, that Cooper actually held at the time the insurance was purchased."); *see Wint v. Fidelity & Cas. Co. of N.Y.*, 9 Cal.3d 257, 265 (1973)("Here, [the insured] had never seen the policy and probably did not even know of its existence, and hence cannot claim that it reasonably led him to expect to be defended.")

    29.   This finding is further supported by the manner in which premiums were assessed under the policy. *See Cooper*, 31 Cal.App.4th at 1108 (examining premium structure in denying coverage because of inconsistency with reasonable expectations of insured after provision found ambiguous).  The premium paid for the basic business auto liability coverage, which included in the schedule five vehicles and one trailer, was $6257.  (Doc. 102, Ex. D at LGI0018.)  The premium paid for the "Employees as Insureds" endorsement, which contains the "business or personal affairs" language, is listed as $365.  *Id*.  While neither party addressed the specific structuring of the premiums, it is in evidence and it is unlikely that an endorsement for business auto coverage for use of an unscheduled "non-owned" personal auto was $365.

    30.   Under any reasonable expectation of the insured, based

**24**

on the insurance policy as drafted, there is no coverage for Mrs.
Hughes's personal Cadillac.


CONCLUSION

Defendant shall submit a form of judgment consistent with
these Findings of Fact and Conclusions of Law within 5 days
following date of service of these Findings of Fact and
Conclusions of Law.


SO ORDERED
Dated: September 30, 2008

                              /s/ Oliver W. Wanger
                              Oliver W. Wanger
                         United States District Judge